UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

LEON SEGEN, derivatively on behalf of
Covansys Corporation,

                              Plaintiff,

                                                    05 Civ. 3509 (RWS)

- against -

                                                    O P I N I O N

CDR-COOKIE ACQUISITIONS, L.L.C.,
CLAYTON, DUBILIER & RICE FUND VI
LIMITED PARTNERSHIP, CD&R ASSOCIATES
VI LIMITED PARTNERSHIP, CD&R INVEST-
MENT ASSOCIATES VI, INC., and
COVANSYS CORPORATION,

                              Defendants.

-----------------------------------------X

                                                    11/6/06

A P P E A R A N C E S:

Attorneys for Plaintiff:

        OSTRAGER, CHONG, FLAHERTY & BROITMAN
        250 Park Avenue, Suite 825
        New York, NY 10177-0899
        By:  GLENN F. OSTRAGER, ESQ.
             Of Counsel

        BRAGAR, WEXLER, EAGEL & MORGENSTERN
        885 Third Avenue, Suite 3040
        New York, NY 10022
        By:  PAUL D. WEXLER, ESQ.
             Of Counsel

Attorneys for Defendants:

        DEBEVOISE & PLIMPTON
        919 Third Avenue
        New York, NY 10022
        By:  DONALD W. HAWTHORNE, ESQ.
             STEPHEN CHAHN LEE, ESQ.
             TATYANA A. TRAKHT, ESQ.
             Of Counsel

January 3, 2006

## **Segen v. CDR Cookie - 05 Civ. 3509**

**Sweet, D.J.,**

Defendants CDR-Cookie Acquisition, L.L.C. ("CDR-Cookie"), Clayton, Dubilier & Rice Fund VI Limited Partnership, CD&R Associates VI Limited Partnership, and CD&R Investment Associates VI, Inc. (together, the "CDR Defendants") have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint of Leon Segen ("Segen") brought derivatively on behalf of Covansys Corporation ("Covansys"). For the reasons set forth below, the motion is granted.

## **Prior Proceedings**

Segen filed this action derivatively on April 4, 2005 on behalf of Covansys to recover alleged short-swing profits obtained by the CDR Defendants through a recapitalization of Covansys. On June 7, 2005, the CDR Defendants moved to dismiss the complaint for failure to state a claim pursuant to Fed. R. Civ. Proc. 12(b). The motion was heard and marked fully submitted on September 7, 2005.

1

**Facts**

According to the complaint, Covansys is a public company in the business of providing information technology services. (Compl. ¶¶ 11, 12.) CDR-Cookie and the other CDR Defendants are alleged to be owned and controlled by Clayton, Dubilier & Rice, Inc. and therefore to have functioned as a "group" for purposes of determining Section 16(b) liability. (Compl. ¶¶ 9-10.)

In March 2000, CDR-Cookie purchased from Covansys 200,000 shares of convertible redeemable series A preferred stock (the "Series A Preferred Stock"), convertible into 8,695,592 shares of Covansys common stock. (Compl. ¶ 11.) In the same transaction, CDR-Cookie was issued warrants to purchase 5,300,000 additional shares of Covansys common stock. (Compl. ¶ 11.) In connection with this purchase of securities, CDR-Cookie secured the right to nominate three directors to Covansys' board, which it exercised, according to the proxy statement, by appointing three employees of an affiliate of CDR-Cookie. Id., see also Schedule 14A, Proxy Statement Pursuant to Schedule 14(a) of the Securities Exchange Act of 1934, dated August 26, 2004 and filed with the Securities Exchange Commission on or about August 19, 2004 (the "Proxy Statement") at 2.[1]

---

[1] "For purposes of a motion to dismiss," the Second Circuit has "deemed a complaint to include any . . . documents incorporated in it by reference, . . . as well as public disclosure documents required by law to be, and that have been, filed with the SEC, . . . and documents that the plaintiffs either possessed or knew about

2

By virtue of CDR-Cookie's ownership of the Series A Preferred Stock, the CDR Defendants are alleged to have had a controlling interest in Covansys, amounting to approximately 24.5% of the voting power of the common stock. (Compl. ¶ 11.) Following further transactions, in November 2001, the CDR Defendants reported that CDR-Cookie owned 32.9% of Covansys's outstanding stock. (Compl. ¶ 12.)

In January 2004, Fidelity Information Services, Inc. ("FIS") began discussions with Covansys that led to FIS's offer to invest in Covansys. FIS's investment was dependent on a recapitalization of Covansys in order to reduce the CDR Defendants' alleged controlling interest. (Compl. ¶ 13.)

On or about April 26, 2004, CDR-Cookie agreed to exchange all of its existing Covansys holdings, comprising 200,000 shares of Covansys Series A Preferred Stock; warrants to acquire 1.8 million (sic) shares of Covansys common stock at an exercise price of $25 per share;[2] and warrants to acquire 1.8 million shares of Covansys common stock at an exercise price of $31 per share, in return for (i) $180 million in cash; (ii) two million shares of Covansys common stock; (iii) a $15 million subordinated note; and (iv) five-

and upon which they relied in bringing the suit . . ." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) (citations omitted).

[2] The complaint is incorrect. As the Proxy Statement recites, CDR-Cookie exchanged warrants to purchase 3.5 million (not 1.8 million) shares at $25 per share. See Proxy Statement at 3; (Hawthorne Decl., Ex. A).

3

year warrants to purchase 5 million shares of Covansys common stock at an exercise price of $18 per share. (Compl. ¶ 14.)

According to the Proxy Statement, Covansys's full board of directors and a special committee which included no representatives or affiliates of the CDR Defendants approved the transaction and recommended it to the company's shareholders.

The transaction was approved by Covansys' shareholders on September 15, 2004, and the parties consummated the transaction. (Compl. ¶ 15.) Form 8-K, Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, dated September 15, 2004 and filed with the SEC on or about September 16, 2004.

The complaint alleges that CDR-Cookie's exchange of derivative securities for a different class of derivative securities, common stock, cash, and notes constitutes a matchable sale and purchase within the meaning of Section 16(b), and that the CDR Defendants should therefore disgorge the "short-swing profit" they purportedly earned in the exchange. The Proxy Statement recited that as the result of a premium paid to CDR-Cookie under the Recapitalization Agreement, Covansys expected to record an accounting charge that would reduce income by approximately $27 million, representing the difference between the value of the consideration paid to CDR-Cookie and the value of the securities exchange by it. (Compl. ¶ 16.) Segen claims that the $27 million

4

accounting charge represents disgorgeable short-swing profits. (Compl. ¶¶ 18, 19.)

Alternatively, the complaint refers to the fact that the recapitalization agreement, annexed to the Proxy Statement, provides that for purposes of the tax treatment of the recapitalization, the parties agreed to report the value of the Series A preferred stock on their tax returns as $224,970,000. (Compl. ¶ 16); see also Recapitalization Agreement between Covansys and CDR-Cookie, dated as of April 26, 2004, filed with the SEC on or about August 19, 2004, as Appendix III of the Proxy Statement (the "Recapitalization Agreement"), p.4. The complaint has alleged that this sum divided by the number of shares of common stock into which the preferred stock was convertible establishes a "value" of $25.8717 per share for the shares "sold" by CDR-Cookie in the recapitalization. (Compl. ¶ 21.)

According to the complaint, CDR-Cookie "purchased" 7 million shares of Covansys common stock in the same transaction, comprising the 2 million shares of common stock and the 5 million $18 warrants. (Compl. ¶ 22.) The complaint claims that all 7 million shares purchased in the transaction should be valued at $10.44 per share, the closing market price of the common stock on the date of the transaction, thereby valuing a derivative security based on the market price of the common on one side of the transaction while assigning a theoretical "value" to the derivative

5

security on the other side of the transaction. Id. The complaint claims that the difference between the theoretical "value" of the shares "sold," of $25.8717 per share, and the market price of the shares "purchased," of $10.44 per share, multiplied by the 7 million matched shares, represents disgorgeable short-swing profits of approximately $108 million.  (Compl. ¶ 23.)

## The 12(b) Standard

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001)).

On a Rule 12(b)(6) motion to dismiss, "mere conclusions of law or unwarranted deductions" need not be accepted. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994). Furthermore, the truth of factual allegations that are contradicted by documents properly considered on a motion to dismiss need not be accepted. See e.g., Rapoport v. Asia Elecs. Holding Co., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). In other words, "'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 176 (2d Cir. 2004) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000); accord Eternity Global Master Fund, 375 F.3d at 176-77.


## There Are No Short-Swing Profits


Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act") requires beneficial owners of more than 10% of any class of an insurer's equity securities to disgorge to the issuer short-swing profits, which consist of any gain realized by the insider on a purchase and sale of the issuer's securities occurring during a six-month period. 15 U.S.C. § 78p(b). Section 16(b) and the rules enacted by the SEC to implement it "operate[] mechanically," requiring matching a purchase and sale within a six

7

month period to determine whether any short-swing profit was realized. See Magma Power Co. v. Dow Chemical Co., 136 F.3d 316, 320-21 (2d Cir. 1998).

The alleged matchable transaction in the complaint involved a simultaneous exchange of (i) a bundle of derivative securities for (ii) a bundle of different derivative securities, common stock, notes, and cash.[3] Rule 16b-6(c)(2), which "covers the calculation of short-swing profits where a derivative security is matched against purchases or sales [of] a different type of derivative security or common stock," prescribes how short-swing profits are to be calculated in this situation. Segen v. Westcliff Capital Mgmt., LLC, 299 F. Supp. 2d 262, 268 (S.D.N.Y. 2004). The Rule states in relevant part:

---

[3] 17 C.F.R. § 240.16a-1(c) states that "[t]he term derivative securities shall mean any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security, or similar securities with a value derived from the value of an equity security . . . ." The securities "sold" by the CDR Defendants -- preferred shares convertible into common stock, warrants to acquire 3.5 million shares of common stock at $25 per share, and warrants to acquire 1.8 million shares of common stock at $31 per share (Compl. ¶¶ 14, 18) -- are derivative securities under these rules. The securities "purchased" by the CDR Defendants were common stock and warrants to purchase 5 million shares of common stock at $18 per share. (Compl. ¶ 14.) The $18 warrants "purchased" were a different type of derivative within the meaning of Rule 16b-6(c)(2) from the derivatives "sold" (the convertible preferred, the $25 warrants, and the $31 warrants). (Compl. ¶¶ 14, 18); cf. Rule 16b-6(c)(1) (derivative securities with "identical characteristics" include "purchases and sales of call options of the same strike price and expiration date) 17 C.F.R. § 240.16b-6(c)(1); Romeo & Dye, Section 16 Treatise and Reporting Guide, § 12.07, 1136 n.11 (2d ed. 2004) (stating that it "logically follows" from Rule 16b-6(c)(1) that "derivatives with different strike prices . . . have 'different' characteristics" for purposes of Rule 16b 6(c)(2)).

8

> Short-swing profits in transactions involving the purchase and sale . . . of derivative securities having different characteristics but related to the same underlying security . . . or derivative securities and underlying securities shall not exceed the difference in price of the underlying security on the date of purchase or sale and the date of sale or purchase.

17 C.F.R. § 240.16b-6(c)(2). Under this rule and the facts alleged, the CDR Defendants made no recoverable short-swing profit, since any profit realized could not exceed "the difference" in the market price of Covansys common stock at a single moment, when the simultaneous exchange of securities occurred. Since at any one moment publicly traded shares have a single market price, the "difference in price" is necessarily zero.

Segen has previously alleged in Westcliff that the proper measure of short-swing profits in matching transactions involving common stock and derivatives under Rule 16b-6(c)(2) was "the difference between the market price of [the] common stock on the date of deemed purchase or sale and the 'actual price' paid by defendants for the derivative security itself; a price to be determined by experts employing complex options-pricing methods such as the Black-Scholes model." Westcliff, 299 F. Supp. 2d at 269. In a thorough opinion, the Honorable William H. Pauley, III, rejected this argument, concluding that the maximum short-swing profit was the difference in the market price of the common stock on the date of deemed purchase and sale. Id. The court concluded:

> Plaintiff's novel position . . . is undermined by the plain language of Rule 16b-6(c)(2), the SEC's own releases concerning the calculation of short-swing profits for matched derivative transactions, the policy behind Section 16, the opinions of leading commentators, the relevant caselaw in this Circuit, and the doctrine of <u>expressio unius est exclusio alterius</u>.

<u>Westcliff</u>, 299 F. Supp. 2d at 269.

No meaningful distinction between the allegations in this action and those in <u>Westcliff</u> have been established by Segen, who has taken the simple position that Judge Pauley erred. (Pl. Mem. in Opp., p.5). Because Judge Pauley's analysis and holding is correct and appropriate, it is adopted here. Because of <u>Westcliff</u> and this conclusion, it is unnecessary to rehearse and repeat the arguments and resolutions there contained.

Rule 16b-6(c)(2) provides that "short-swing profits in transactions involving the purchase and sale . . . of . . . derivative securities and underlying securities shall not exceed the difference in price of the underlying securities." Segen interprets the rule to mean "short-swing profits other than those deriving from control premiums." (Pl. Mem. in Opp., pp. 11-14).

However, contrary to Segen's assertion, the rule simply applies to the "profits" attributable to a transaction without further qualification -- which would include profits arising from market movements, interest rate shifts, changes in the volatility

10

of the underlying securities, control premiums, or any other source. This bright-line rule is consistent with the purpose of Rule 16b-6(c)(2) to avoid "turning every case involving derivative instruments into a battle of experts over competing models of option valuation," by providing "benchmarks or rules of thumb" for determining short-swing profits in such transactions. Ownership Reports and Trading By Officers, Directors and Principal Stockholders, Exchange Act Release No. 26,333, 53 Fed. Reg. 49,997, 50,009 (Dec. 13, 1988).

The cases cited in Segen's brief on this issue predate the enactment of the rule in 1991. (Pl. Mem. in Opp., pp. 12-13). In fact, the cases cited by Segen support that when Section 16(b) and the rules enacted pursuant to it, including Rule 16b-6(c)(2), refer to the "profits" recoverable on short-swing transactions, this term is intended to encompass any profit realized on a transaction, including any profit attributable to a control premium. In Schur v. Salzman, 365 F. Supp. 725 (S.D.N.Y. 1973), the defendant sought to exclude the portion of a purchase price attributable to a control premium from the calculation of short-swing profits. The court rejected the defendant's attempt to "fragmentize the purchase price" as counter to the "explicit language and clear purpose of the statute" to surrender "'any profit realized' on the proscribed transactions." Id. at 730 (citing 15 U.S.C. § 78p(b)(1970). Segen has adduced no authority to suggest that when the SEC provided for a cap on "short-swing

11

profits" in transactions including derivatives, it intended on this one occasion to change the meaning of "profit" used throughout the short-swing statutes and regulations to exclude profits on control premiums.  See, e.g., Newmark v. RKO General, Inc., 425 F.2d 348, 357 (2d Cir. 1970) (including control premium in calculation of short-swing "profits.").

Segen has also urged either that Rule 16b-6(c)(2) was intended to apply to "actual" prices, rather than market prices, or that actual prices apply in private transactions, if not in public ones.  (Pl. Mem. in Opp., p. 16).  There is no authority cited for distinguishing between public and private market transactions in the application of this rule.

Segen's only response to Judge Pauley's holding in Westcliff is to claim that there was "no support" for Judge Pauley's views and that Section 16(b) should be read "expansively." (Pl. Mem. In Opp., p. 15).  In fact, as the Supreme Court has said, since section 16(b) imposes liability without fault, the rule operates only within "narrowly drawn limits." Foremost-McKesson, Inc. v. Provident Securities Co., 423 U.S. 232, 251 (1976); see also Gollust v. Mendell, 501 U.S. 115, 122 (1991) ("we have been reluctant to exceed a literal, 'mechanical' application of the statutory text in determining who may be subject to liability").  As set forth above, Judge Pauley's holding is adopted here.

12

Finally, Segen has urged that Rule 16b-6(c)(2) exceeded the SEC's rule-making authority. (Pl. Mem. in Opp. p.p. 16-17). Section 16(b) expressly confers on the SEC the authority to enact rules or regulations exempting transactions from the reach of the statute "as not comprehended within the purpose" of the statute. 15 U.S.C. § 78(b) (2005). Where, as here, "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44 (1984).

No court has struck down any aspect of the rules enacted by the SEC in 1991 to cover transactions involving derivative securities. The two cases cited by Segen (Pl. Mem. in Opp., pp. 16-17), have nothing to do with Rule 16(b)-6(c)(2) and have been rejected by the SEC as based on an outdated understanding of derivatives. See Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 28,869, 56 Fed. Reg. 7242, 7250-51 (Feb. 8, 1991).

In the years of proposals and comment leading to the enactment of Rule 16b-6(c)(2), the Commission expressly considered that adopting "benchmarks or rules of thumb" would best balance

13

"the interests of precision" and "the costs of computation," and that "[t]he interests of justice and Congress' purpose in adopting section 16(b) will not be served by turning every case involving derivative instruments into a battle of experts." Exchange Act Release No. 26,333, 53 Fed. Reg. 49, 997, 50,009. Segen has not established that the balance of the interests in precision and computation cost reflected in Rule 16b-6(c)(2) is arbitrary, capricious, or manifestly contrary to the purposes of Section 16(b).

As has been stated in a similar context, "[t]he Supreme Court has advised a literal, narrow reading of Section 16"; urging readings that ignore the plain meaning of the applicable rules "would be in contradiction to the explicit instructions of the Supreme Court." Gwozdzinsky, 913 F. Supp. at 313 (citing Blau v. Lehman, 368 U.S. 403 (1962)). Given the unequivocal conclusions of the Westcliff court, the unambiguous meaning of the authority on which it relied, and the Supreme Court's guidance about the application of Section 16, there are no short-swing profits under the applicable authorities.

## The Transaction Was Exempt

### A. The Transaction Was Between The Issuer And Its Directors

14

Rule 16(b)-3 exempts from Section 16(b) liability all transactions between an issuer and its directors involving the issuer's equity securities, provided that the transaction is approved in advance by the board of directors, its disinterested directors, or the company's shareholders.[4] 17 C.F.R. § 240.16b-3(a), (d) and (e) (2005). As the Second Circuit has stated, "[s]o long as the relevant securities transaction is between an issuer and insider, and so long as the terms and conditions of that transaction receive advance approval by the board of directors, there exists sufficient protection to ensure that any short-swing profit taking that follows is not the result of unfair market manipulation." Gryl v. Shire Pharm. Group PLC, 298 F.3d 136, 145 (2d Cir. 2002), cert. denied, 2003 U.S. LEXIS 1155 (U.S. Feb. 24, 2003). In this case, the CDR Defendants' transaction was approved by Covansys's board, its disinterested directors, and its shareholders, and is entitled to exemption for both reasons.

The complaint alleges that the CDR Defendants acquired a controlling interest through holding nearly a third of Covansys' common stock and that, in connection with this investment, they

_____

[4] While the Third Circuit in Levy v. Sterling Holding Co., 314 F.3d 106 (3d Cir. 2002), cert. denied, 540 U.S. 947 (2003), imposed an additional limitation that the exemption is only available for transactions with a compensatory purpose, that holding has been rejected by the SEC as "not in accord with our clearly expressed intent in adopting the rule." Ownership Reports and Trading By Officers, Directors and Principal Security Holders, Exchange Act Release No. 49,895, 69 Fed. Reg. 35,982, 35, 983 (June 25, 2004) ("Proposed Rules"). The SEC has initiated a rulemaking to clarify that Levy misinterpreted Rule 16b-3. See id.

15

secured the right to appoint three directors to its board. (Compl. ¶¶ 11-12.) According to a public filing, this right was exercised to appoint three employees of CD&R entities to serve as Covansys directors. (Proxy Statement at 5.) These alleged facts are sufficient to qualify the CDR Defendants as directors "by deputization" for purposes of Section 16(b) and therefore entitle them to the Rule 16(b)-3 exemption. See Feder v. Martin Marietta Corp., 406 F.2d 260 (2d Cir. 1969), cert. denied, 396 U.S. 1036 (1970) (holding company to have deputized its CEO to serve on board of issuer, and therefore to be liable for short-swing profits, where CEO's membership on issuer's board was approved by CEO's company); Brief of the SEC amicus curiae, Dreiling v. Am. Express Travel Related Servs. Co., 351 F. Supp. 2d 1077 (9th Cir. 2005) (No. 04-35715), at 21, 27 (directors by deputization may rely on exemption under Rule 16b-3(d).

According to Segen, the deputization doctrine "does not serve to allow an exemption to be imputed to the principal." (Pl. Mem. in Opp. p. 19), citing Dreiling v. American Express Travel Related Services Co., 351 F. Supp. 2d 1077, 1090 (W.D. Wash. 2004), appeal docketed, No. 04-35715 (9th Cir. Aug. 2004), which holds to the contrary, as does the SEC's interpretation of its regulation in the amicus brief filed in that case, to which a court in this circuit "must defer" unless it is "plainly erroneous or inconsistent with the regulations." Gryl v. Shire Pharm. Group PLC, 298 F.3d 136, 145 (2d Cir. 2002); see Brief of the SEC amicus

curiae, <u>Dreiling v. Am. Express Travel Related Servs. Co.</u>, 351 F. Supp. 2d 1077 (9th Cir. 2005) (No. 04-35715), http://www.sec.gov/litigation/briefs/dreiling040505.pdf.

The SEC has issued a final rule clarifying that <u>Levy v. Sterling Holding Co.</u>, 314 F.3d 106 (3d Cir. 2002), <u>cert.</u> denied, 540 U.S. 947 (2003), on which Segen has relied (Pl. Mem. in Opp. p. n.14), misinterpreted Rule 16(b)-3 and that exemptions under Rule 16(b)-3(d) are not limited to transactions with compensation-related functions. <u>Ownership Reports and Trading by Officers, Directors and Principal Security Holders</u>, Exchange Act Release No. 52,202 (Aug. 3, 2005). Because this rule is a clarification of pre-existing regulations, it has retroactive effect and applies to the transaction at issue in this case. <u>See</u> <u>id.</u>

Segen also characterizes <u>Dreiling</u> as "implicitly" holding that exemption under Rule 16(b)-3 is available only to a deputized director that holds less than 10% of the issuer's shares. (Pl. Mem. in Opp. pp. 20-21). This "shareholder" exception to Rule 16(b)-3 is not present in <u>Dreiling</u> or the SEC's amicus brief, and the SEC has expressly rejected it, stating that, while the exemption is not available to every 10% holder, "Rule 16b-3 is available to [a holder of ten percent or more of the issuer's shares] . . . who is also subject to Section 16 by virtue of being an officer or director with respect to transactions with the

17

issuer." (Exchange Act Release No. 37,260, 61 Fed. Reg. 30,376, 30,379 at n.42.)

The complaint alleges that the CDR Defendants controlled Covansys, owned 32.9% of its shares, and in connection with their investment obtained the power, which they exercised, to appoint three directors to Covansys' board. (Compl. ¶¶ 11-12.) These facts, which are undisputed for the purposes of this motion, are sufficient to establish that the CDR Defendants are entitled to the exemption. For example, in Lewis v. Dekcraft Corp., No. 69 Civ. 2982, 1974 U.S. Dist. LEXIS 7862, Fed. Sec. L. Rep. (CCH) ¶ 94,620 (S.D.N.Y June 27, 1974), the court held that deputization was established based on the undisputed facts that the deputizing company had acquired 36% of the issuer, thereby gaining control, and pursuant to that transaction gained and exercised the right to appoint four members to the issuer's board. The Dekcraft court concluded that such facts were "far more compelling than the facts which led the Court of Appeals in Feder v. Martin Marietta Corp., 406 F.2d 260, 263 (2d Cir. 1969) to conclude that the district court's finding of no deputization was clearly erroneous." Id. at *8.

By contract, the cases cited by Segen in which deputization was not found, the officer of a corporation or a member of a partnership was sitting on an issuer's board at the time the corporation or partnership acquired the issuer's shares.

18

See Blau v. Lehman, 368 U.S. 403, 407-410 (1962); Rattner v. Lehman, 193 F.2d 564, 566 (2d Cir. 1952); Colan v. Cutler-Hammer, Inc., Fed. Sec. L. Rep. (CCH) ¶ 92,806 at 93,947, n.9 (N.D. Ill. 1986), aff'd on other grounds, 812 F.2d 357 (7th Cir. 1987).

The recapitalization transaction was approved by Covansys' Board, its disinterested directors, and its shareholders. See Proxy Statement at 4-7 (approval by Board and by disinterested directors); Form 8-K (approval by shareholders). Accordingly, the CDR Defendants' transactions pursuant to the Recapitalization Agreement "fall [] squarely within this exemption," in which "[t]here is no reason to look further." Gwozdzinsky, 913 F. Supp. at 314.

## The Transaction Was A Reclassification

Since the CDR Defendants were the sole owners of Series A Preferred Stock (see Proxy Statement at 19), the recapitalization transaction, in which the CDR Defendants exchanged all of their Series A Preferred Stock, had the effect of exchanging all securities of this class for other securities and consideration. As regards the Series A Preferred Stock (which comprises part or all of the basis for Segen's calculation of "short-swing profits"), the recapitalization is a reclassification exempt from short-swing liability.

19

While the text of Rule 16b-7 currently refers only to "mergers" and "consolidations," the SEC has construed the Rule as applying to reclassifications as well. In a 1981 interpretive release, the staff stated that "Rule 16b-7 . . . can apply to transactions involving reclassifications." Interpretive Release on Rules Applicable to Insider Reporting and Trading, Exchange Act Release No. 18,114, 46 FR 48147, 48,176 Q. 142 (Oct. 1, 1981). In 1991, the Commission amended the title of the Rule to include "reclassifications," explaining that the amendment was not intended to effect any "substantive" change to the rule, and reaffirming that the Rule applies to reclassifications. (Exchange Act Release No. 28,869, 56 FR 7242 (cited in Proposed Rules at 35,984); see also Form 8-K Disclosure of Certain Management Transactions , Exchange Act Release No. 45,742, 67 FR 19,914, at 19,919 n.56 (Apr. 12, 2002) (describing reclassification as among the transactions exempted by Rule 16b-7)).

Although Segen has urged that "the rule has no applicability to a transaction involving cash consideration" (Pl. Mem. in Opp. p. 24), a leading commentator has stated, "it has been held that a right to receive cash instead of securities will not affect the availability of the exception." Romeo & Dye, Section 16 Treatise and Reporting Guide § 13.05, 1162 (2d ed. 2004) (collecting citations).

20

## Conclusion

For the reasons set forth above, the complaint is dismissed. Segen is granted leave to move to file an amended complaint within 20 days.

It is so ordered.

**New York, NY**
**January** $\mathcal{4}$ **, 2005**

ROBERT W. SWEET
U.S.D.J.